```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

NATIONAL ASSOCIATION FOR THE              :
SPECIALTY FOOD TRADE, INC.,
                                          :
              Plaintiff,                         **REPORT and RECOMMENDATION**
                                          :
            -against-                            04 Civ. 2983 (DLC)(KNF)
                                          :
CONSTRUCT DATA VERLAG AG,
                                          :
              Defendant.
------------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE DENISE L. COTE, UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Plaintiff National Association for the Specialty Food Trade, Inc. ("NASFT") sought and

obtained a judgment by default after the defendant failed to respond to its discovery demands and

advised the court that it would no longer defend itself in this action brought under the Lanham

Act and New York statutory and common law, for: (i) trademark infringement; (ii) unfair

competition; (iii) false advertising; and (iv) dilution.  Thereafter, the previously assigned district

judge referred the matter to the undersigned to conduct an inquest and, thereafter, report and

recommend the amount of damages including attorneys' fees and costs, if any, to be awarded to

the plaintiff.

The Court directed the plaintiff to serve and file proposed findings of fact and

conclusions of law and an inquest memorandum setting forth its proof of damages, costs of this

action, including attorneys' fees and any applicable interest.  The Court also directed the

defendant to serve and file any opposing memoranda affidavits and exhibits, as well as any

alternative findings of fact and conclusions of law it deemed appropriate.  The plaintiff's

submissions aver that it is entitled to recover from the defendant: (1) $139,200 in damages,

which, when trebled, because of the defendant's willful misconduct, equals $417,600;

(2) $75,896 in attorneys' fees; and (3) $10,375.94, for the costs the plaintiff incurred in

connection with this action.  In addition, the plaintiff contends it is entitled to recover pre-

judgment interest at the rate of nine per centum per annum.  The defendant did not make any

submissions to the Court in response to those made by the plaintiff.

## II.  BACKGROUND

When a defendant defaults in an action, the plaintiff's factual allegations must be

accepted as true, except as they relate to damages, see Cotton v. Slone, 4 F.3d 176, 181 (2d Cir.

1993); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).

In addition, the plaintiff is entitled to all reasonable inferences from the evidence presented.

See Au Bon Pain Corp. v. Artect, Inc., et al., 653 F.2d 61, 65 (2d Cir. 1981).  Based upon the

submissions made by the plaintiff, the complaint filed in the instant action, and the Court's

review of the entire court file in this action, the following findings of fact are made:

NASFT is an international business trade association, whose mission is to foster trade,

commerce and interest in the food industry.  Its membership includes domestic and foreign

manufacturers, importers, distributors, brokers, retailers, restauranteurs, caterers and others in the

speciality food business.  NASFT is a 2,409-member organization.  The defendant is a limited

liability company organized and existing under the laws of Austria.  It is engaged in the business

of printing, publishing and distributing directories and guides to exhibitions and fairs in various

industries around the world.  As part of its business, the defendant solicits exhibitors at various

industry trade shows to advertise in its alleged on-line publications, for a fee.

Since 1952, NASFT has used the trade name National Association for Specialty Food

Trade and the service mark NASFT in connection with the trade show exhibitions, educational

conferences, seminars and lectures it provides for the food industry.  NASFT has registered its

marks and variants thereof in the United States Patent and Trademark Office and owns the

following United States trademark registrations: No. 1,980,663 for NASFT; No. 2,137,883 for

NASFT FANCY FOOD SHOW; and No. 1,925,821 for NASFT INFOLINK.

Beginning in 1995, NASFT organized and sponsored its NASFT FANCY FOOD

SHOWS.   According to NASFT, these events are well-attended, well-regarded and considered to

be the premiere marketplace for reaching the specialty food industry.  NASFT's shows attract as

many as 30,000 representatives from specialty food, wine, gift and department stores, as well as

supermarkets, restaurants, mail order and other retail businesses.  NASFT markets, promotes and

advertises its NASFT and NASFT FANCY FOOD SHOW services at its trade shows, in print

and on-line advertising and through brochures and direct mail endeavors.

In or about Autumn 2000, the defendant began to solicit exhibitors at NASFT's winter

NASFT FANCY FOOD SHOW by mailing a pre-printed form to the exhibitors.  That form

contained the recipient company's name and address.  In addition, displayed in large print on the

form was the following:

> The FAIRGUIDE lists you under the following event: "NASFT FANCY FOOD
> WINTER."

The pre-printed form requested additional contact information from the recipient

exhibitor and asked the exhibitor to sign and return the form.  The exhibitor was advised, in

small print that appears on the form, that by signing the document, the exhibitor agreed to allow

the defendant to publish the exhibitor's contact information as an advertisement in the

defendant's "FAIRGUIDE" for three years, at an annual fee of $851.  As a result of the

defendant's conduct, NASFT members and exhibitors at its shows, believed, mistakenly, that

NASFT sponsored, endorsed, licensed and/or authorized the defendant's solicitation and

"FAIRGUIDE."

Beginning in December 2000, and continuing through the Spring of 2001, NASFT gave

the defendant written notice of its trademark rights and demanded that the defendant cease its use

of NASFT's trade name and service marks.  Thereafter, according to the plaintiff, the defendant

ceased using NASFT's name and marks.

However, in or about the Winter of 2004, NASFT learned the defendant had resumed

soliciting NASFT's members and trade show exhibitors by distributing a pre-printed form,

similar to the one discussed above, identifying the event at which the form recipient was

participating as either NASFT's FANCY FOOD SUMMER or NASFT FANCY FOOD

WINTER.  This time, the defendant offered to publish an advertisement containing an exhibitor's

contact information in the "FAIRGUIDE," for three years, for a fee of $981 per year.  Once

again, according to the plaintiff, its members and other trade show exhibitors believed,

mistakenly, that the defendant represented, was sponsored by or was approved by NASFT and,

therefore, executed the defendant's "FAIRGUIDE" solicitations, based on that false belief.

When its members and other trade show exhibitors learned the defendant was not affiliated with

the plaintiff in any way, and sought to cancel the advertisement orders they had placed with the

defendant, the defendant refused to accept the cancellations.

It is clear that at least from December 2000, the defendant was fully aware of the

existence of NASFT's trademark rights but, none the less, as late as 2004, the defendant elected

to use NASFT's trade name and service marks to create the impression among NASFT's

members, and those who were exhibitors at NASFT's trade shows, that the defendant's

"FAIRGUIDE" advertisement solicitations were in some way associated with or otherwise

sponsored, endorsed or licensed by NASFT.  NASFT reports that dozens of its members have

reported to it that they received infringing solicitations from the defendant bearing NASFT's

name and mark.

As noted above, after the plaintiff initiated this action in 2004, and made discovery

demands upon the defendant, the defendant failed to provide any responsive information,

including any documents regarding the profits it reaped as a result of the infringing conduct

described above.  As a consequence, the plaintiff has been unable to ascertain, with any certainty,

the profits garnered by the defendant, through its misconduct.

### III.  CONCLUSIONS OF LAW

A default judgment in an action establishes liability, but is not a concession of damages.

See Cappetta v. Lippman, 913 F. Supp. 302, 304 (S.D.N.Y. 1996) (citing Flaks v. Koegel,

504 F.2d 702, 707 [2d Cir. 1974]).  Damages must be established by the plaintiff in a post-

default inquest.  Id.  In conducting an inquest, the court need not hold a hearing "as long as it

ensured that there was a basis for the damages specified in the default judgment."  Transatlantic

Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)(quoting

Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 [2d Cir. 1989]).  The court may rely on

affidavits or documentary evidence in evaluating the fairness of the sum requested.  See Tamarin

v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993).

*Claims Under the Lanham Act*

Under the Lanham Act, a prevailing plaintiff in an action such as the one at bar, is

generally entitled to recover: (1) the defendant's profits; (2) any damages sustained by the

plaintiff; and (3) the costs of the action.

NASFT seeks damages for trademark infringement under 15 U.S.C. § 1114.  In its most

pertinent part, the statute provides that:

> Any person who shall, without the consent of the registrant-- (a) use in commerce any reproduction, counterfeit, copy . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).

NASFT also seeks damages for unfair competition and false designation of origin under

15 U.S.C. § 1125.  That statute provides, in relevant part, the following:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Relying upon "internet research," specifically, "Excess Voice," an on-line newsletter for

copywriters, and an article by Robbin Steif, CEO of LunaMetrics, offered electronically by the

Web Analytics Association, the plaintiff estimates that 2% of its 2,409 members purchased

advertising in the defendant's on-line directory for a three-year period, at a cost to each member

of $2,943, thus garnering profits for the defendant estimated to be $139,200.  The plaintiff

suspects that only 2% of its membership purchased advertising in the defendant's on-line

directory because its "internet research" indicates that responses to solicitations made

electronically, like those made by the defendant, which are akin to, but not the same as direct-

mail solicitation responses, have a 2% success rate or "conversion rate."

While the Court understands the plaintiff was unable to obtain precise information from

the defendant concerning the profits it reaped through its infringing activity, the record before the

Court indicates the plaintiff had or could have obtained from its members the exact number of

persons or entities associated with NASFT that purchased advertising in the defendant's on-line

directory, thus, obviating the need to speculate about the number of NASFT members who did

so.  This is so because, the affidavit submitted by Gerry Shamdosky ("Shamdosky"), NASFT's

vice president, finance and administration, in connection with the instant inquest on damages,

advises that "dozens of NASFT's members have received an infringing solicitation from

Defendant bearing Plaintiff's name and mark."  Shamdosky could not have made that statement

unless the plaintiff possesses hard evidence of the number of its members who received the

defendant's infringing solicitations.

In addition, submissions made by the plaintiff, in connection with its application for

attorneys' fees, contain information indicating that NASFT's members communicated with it

electronically concerning the funds they paid to the defendant, for advertising, in response to the

defendant's infringing solicitations.  Therefore, it appears the plaintiff could have surveyed its

members, electronically, and determined precisely how many of them purchased advertising, in

the defendant's on-line directory, as a result of receiving a solicitation(s) from the defendant, and

the amounts they paid the defendant for that advertising.  This information could have been

ascertained by the plaintiff regardless of whether the defendant complied with its discovery

obligations.

In any event, the plaintiff did not provide any competent evidence to the Court

demonstrating that either the copywriter's newsletter or the Analytics Association article is a

resource upon which entities in the plaintiff's industry rely, in circumstances such as this, to

establish either the "conversion rate," for electronically transmitted advertising solicitations or

any other matter(s) of significance in the conduct of their business affairs.  Since the Court lacks

any basis upon which to conclude that relying on these writings to understand and accept the

methodology employed by the plaintiff to calculate the profits earned by the defendant, through

its infringing conduct, is reasonable and appropriate, the Court declines to do so.

In determining to reject the methodology for fixing damages proffered by the plaintiff, the

Court has considered, generally, Fed. R. Evid. 702 and the admonition from the Supreme Court

that damages awarded to compensate a party should rest on "a just and reasonable estimate of the

damage based on relevant data."  Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S. Ct.

574, 580 (1946).  The Court remains mindful of the fact that, when an infringer has not fulfilled

its discovery obligations, thereby hampering a plaintiff's calculation of the infringer's profits, a

court should grant an inference in favor of the plaintiff.  See In Design v. Lauren Knitwear Corp.,

782 F. Supp. 824, 832-33 (S.D.N.Y. 1991).  However, "[a]llowance for uncertainty is one thing,

and rank speculation another."  Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 506 (7th Cir. 1992).

Here, the Court finds the plaintiff's claim respecting the defendant's profits, based on the

methodology described above, is too speculative to support an award of damages.

*Attorneys' Fees*

NASFT has requested that the court award it the attorneys' fees it incurred in prosecuting

this infringement action.  In "exceptional cases," reasonable attorneys' fees may be awarded to a

successful plaintiff in an action brought pursuant to the Lanham Act.  See 15 U.S.C. § 1117(a).

An exceptional case is one in which there is evidence of fraud, bad faith, or willful infringement. See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1383 (2d Cir. 1993); Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999).  As noted earlier in this writing, the defendant defaulted in this action thereby establishing its willful violation of the trademark law.  See Tiffany (NJ), Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003). Since the defendant defaulted in this action, an award to the plaintiff of its reasonable attorneys' fees is warranted.

In prosecuting this action against the defendant, NASFT engaged the services of the law firm Baker Botts LLP.  Doreen L. Costa ("Costa"), a partner in the intellectual property department of the firm, submitted an affidavit setting forth: (a) a summary of the hours that law firm personnel assigned to this matter devoted to this action; (b) biographical information describing the background and experience of each attorney who assisted in the prosecution of the action; and (c) law firm billing records describing the nature of the work performed by the law firm personnel assigned to this matter and the hourly rates at which the law firm billed the plaintiff for the legal services its personnel provided.  See New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983).  The affidavit indicates that 186.30 hours were expended by law firm personnel reviewing the case file, preparing the pleadings, communicating with the client, conferring among themselves regarding litigation strategy, conferring with counsel to the defendant, and interacting with staff of the previously assigned district judge.  The affidavit establishes that 4.40 hours of the total hours expended by law firm personnel were devoted to tasks performed in 2000 and 2001.  Since the instant action was not commenced until 2004, the Court finds that the activities performed in those 4.40 hours are too remote in time from the date on which this action was commenced to be included in the award of

attorneys' fees the plaintiff seeks for enforcing its trademark rights through the instant action.

The submissions made by the plaintiff indicate that the hourly rates billed by two attorneys who rendered legal services to the plaintiff, Costa and Robert M. Wasnofski, Jr. ("Wasnofski"), changed during the course of the litigation.  Costa's hourly billing rate increased from $490 to $540 and Wasnofski's hourly billing rate increased from $400 to $440.  As noted earlier, Costa is a partner in the law firm, while Wasnofski and Abigaila A. Rubinstein ("Rubinstein"), the remaining attorney assigned to work on this matter, were, at all relevant times, associates with the law firm.  Rubinstein's hourly billing rate remained constant, at $325, throughout the litigation.  Based upon the biographical information concerning the three attorneys that was provided to the Court, the Court's understanding of the hourly rates charged by attorneys in the community who are of equivalent skill and experience as the attorneys whom the plaintiff engaged to provide it legal services and the specialized nature of the intellectual property legal practice, the Court finds that the hourly rates at which the law firm billed the plaintiff for the attorneys' work, are not unreasonable.

In addition to the attorneys who were assigned to this matter, paralegals and law clerks were also enlisted to help represent the plaintiff.  The hourly rates at which the law firm billed the plaintiff for paralegal services varied; they include $175, $200, and $215.  The plaintiff did not provide any information about the individual paralegals who were assigned to work on the matter so that the Court might assess the background and experience these individuals possess that may substantiate the law firm's determination to bill the plaintiff for their work at the hourly rates of $175, $200, and $215.  In like manner, no information was provided to the Court about the background and experience of the "senior paralegal" who was assigned to work on this matter, and whose services were billed at the hourly rate of $230.

The plaintiff's submissions also indicate that two law clerks, whose hourly billing rates were $225 and $240, respectively, were also assigned to perform tasks in connection with this litigation.  Here, again, the plaintiff provided no information to the Court concerning the background and experience of either law clerk that might explain the differing hourly rates at which their services were billed or which might provide the Court a means by which to assess whether the hourly rates at which the law clerks' services were billed are reasonable.  As a consequence of this lack of information, the Court finds that it would be reasonable and appropriate to reduce the hourly rates at which the law firm billed the plaintiff for the services the paralegals, law clerks and a senior paralegal rendered to it.

Inasmuch as an award of attorneys' fees, in a circumstance such as this, is a discretionary act, see 15 U.S.C. § 1117, the Court has determined that $180 is a reasonable hourly rate for paralegal services, $200 is a reasonable hourly rate for the work performed by a senior paralegal and $230 is a reasonable hourly rate for law clerk work.  Accordingly, using a loadstar method (hourly rate x hours reasonably expended), the Court finds that an award of $68,023.50 for the reasonable attorneys' fees incurred by the plaintiff in prosecuting this action, is appropriate.

The submissions made by the plaintiff indicate that it incurred $10,375.94 in costs in connection with the prosecution of this action.  However, $106.95 is attributable to activities occurring during 2000 and 2001, a period well before the initiation of the instant action. Therefore, the Court has determined not to consider those costs in its analysis of the award to be made to the plaintiff for its costs.  When $106.95 are subtracted from $10,375.94, the remaining costs the plaintiff incurred in prosecuting this action are $10,268.99.  The lion's share of that amount, $7,470, represents the cost the plaintiff incurred effecting service of process upon the defendant in Austria, where it is located.  The Court's review of the data included in the

plaintiff's submissions that identify how the remaining costs were incurred, persuades the Court

that these costs, like the cost the plaintiff incurred to effect service of process on the defendant,

were reasonable.  When the costs the plaintiff incurred in connection with prosecuting this action

are combined with its attorneys' fees, their sum is $78,292.49.  The plaintiff is entitled to an

award for attorneys' fees and costs equal to that amount.

*Prejudgment Interest*

The plaintiff has requested that the court award it prejudgment interest at the rate of nine

per centum per annum, the statutory rate of interest in New York.  See New York Civil Practice

Law and Rules § 5004.  "Although Section 1117(a) does not provide for prejudgment interest,

such an award is within the discretion of the trial court and is normally reserved for 'exceptional'

cases." American Honda Motor Co., Inc. v. Two Wheel Corp., 918 F.2d 1060, 1064 (2d Cir.

1990).

In the case at bar, the Court finds that awarding prejudgment interest to the plaintiff is

appropriate to give effect to the compensatory scheme Congress contemplated would be

employed when trademark rights have been infringed.  The purpose of that compensatory scheme

is to: (i) ensure that an infringer not profit in any way from its misconduct; and (ii) provide a

specific and general deterrent to those who might exploit another's trademark rights without

authorization.  Accordingly, a discretionary award of prejudgment interest to the plaintiff is

warranted in this case.

*Post-Judgment Interest*

28 U.S.C. § 1961 informs that "[i]nterest shall be allowed on any money judgment in a

civil case recovered in a district court. . . .  Such interest shall be calculated from the date of the

entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury

yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment." 28 U.S.C. § 1961(a).

Based upon the express language in the above-noted statute, the plaintiff is entitled to an award of post-judgment interest calculated by the Clerk of Court in accordance with the provisions of the statute.

*   *   *

Plaintiff shall serve the defendant with a copy of this Report and Recommendation and shall submit proof of service to the court.

## IV.  RECOMMENDATION

For the reasons set forth above, the Court recommends that no monetary award for damages be made.  The Court recommends further that the plaintiff be awarded: (a) $68,023.50 for the attorneys' fees it reasonably incurred in prosecuting this action; and (b) $10,268.99 for the costs reasonably incurred in prosecuting this action.

The plaintiff should receive an award of prejudgment interest, calculated by the Clerk of Court at the rate of nine per centum per annum, as well as an award of post-judgment interest calculated by the Clerk of Court, in accordance with 28 U.S.C. § 1961.

## V.  FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Denise L. Cote, 500 Pearl Street, Room 1040, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York 10007.  Any requests for an extension of

time for filing objections must be directed to Judge Cote.  FAILURE TO FILE OBJECTIONS

WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW. See Thomas v. Arn 474 U.S. 140 (1985); IUE AFL-CIO

Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298,

300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v.

Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York                    Respectfully submitted:
       December 11, 2006


_Kevin Nathaniel Fox_

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE